IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LKS ENTERPRISES, LLC, an Oregon
limited liability company,

                                                Case No. 6:16-cv-00785-MC

        Plaintiff,                                          ORDER

    v.

CITY OF SILVERTON, a municipal
corporation and DARYL JONES,

        Defendants.
_____

MCSHANE, Judge:

        Plaintiff LKS Enterprises, LLC, a construction company, brings suit against the City of Silverton and its building inspector for violating plaintiff's right to substantive due process, interfering with its business relationships, and defamation. All of these claims are based on the plaintiff's belief that it was being treated unfairly by the building inspector when permits were not issued and code violations were found in connection with four residential construction projects. Plaintiff, for the most part, does not contest the validity of the inspector's decisions based on the building codes. Rather, plaintiff contends that they were arbitrarily being applied to

1 –ORDER

it in a retaliatory manner. Because plaintiff was not entitled to have his work permitted due to code violations, he cannot establish he had a federally protected property interest under a substantive due process analysis. Because plaintiff's evidence of retaliation, defamation, and interference with economic relationships is based on rumor and mere speculation, its state claims fail as well. Defendants' motion for summary judgment, ECF No. 16, is GRANTED.

## BACKGROUND

Bill Stanley is LKS's project manager.[1] In early 2015, he applied for and received building permits to construct four residential homes in Silverton. Just before the framing was completed on the first home (810 Pioneer) Stanley fired Todd Franks, the framing subcontractor, because Franks allowed his worker's compensation insurance to lapse. Franks had subcontracted the framing work to Jose Garcia Construction. Stanley Depo.; Piscadlo Decl. Ex. 1, 8; ECF No. 17. Garcia attempted to finish the job using his own insurance, but Stanley refused Garcia further access to the site and refused to pay Garcia's workers for the work that was substantially completed. Stanley hired another company to finish the framing.

Stanley then requested a framing inspection from the City of Silverton. On April 16, 2016, Jones arrived to perform the "rough in – combo" inspection. Jones stopped the inspection because the house was not ready. Piscadlo Decl. Ex. 9, 6. Jones listed eight violations before stopping the inspection. Among the alleged violations were: fire blocking of garage ceiling to rear wall; post to beam attachment was inadequate; improper anchorage of 2x4 ledger to glue lam supporting floor joists; and additional engineering required due to variation of headers from approved plans. *Id.* Thus began the contentious relationship between Jones and Stanley.

---

[1] Stanley's wife, daughter, and mother are also involved in LKS's activities.

2 –ORDER

Stanley alleges "Jones began to single LKS Enterprises out for minor or, in some cases, nonexistent code violations." Stanley Decl. ¶ 5; ECF No. 30. Curiously, despite pointing to the framing inspection in support of his claims, Stanley admits the house was not ready for inspection that day. In fact, Stanley "knew there was going to be some corrections on it because of the framing problems issues on it. And this was also going to be part of my leverage with the framer that you have some problems that you need to take care of." Stanley Depo. Piscadlo Decl. Ex. 1, 13. Even after reviewing the codes, Stanley admits there were several code violations at the time of the framing inspection. *Id.* at 15.

Stanley went to Jones's office and challenged some of the alleged violations. The two disagreed on whether Stanley could substitute 4 x 12 lumbar for 3 ½ x 9 ½ glulams shown on the plans. Stanley told Jones "he could not allege corrections without citing code" and that he would report Jones to the State of Oregon Building Code Division. Stanley Decl. ¶ 6; ECF No. 30. Jones subsequently began citing the code in all future inspections.

On April 22, 2015, Jones issued a stop work notice on 810 Pioneer. Piscado Decl. Ex. 13. In Stanley's opinion, a stop work (or "red tag) notice is "extremely rare. None of the listed reasons for the red tag were health or safety-related, or have been the basis for any red tag in any project that I have dealt with in the past." Stanley Decl. ¶ 7. On the stop work order, Jones noted:

> The above mentioned structure is not in compliance with the approved plans and engineering submitted for the issuance of a building permit.
>
> - Engineered Structural beams have been changed without proper documentation from the engineer of record.
>
> - Structural details outlined in the engineering for hardware have not been installed or have been substituted without approval by the building Official or the Engineer of Record.

3 –ORDER

- Ledger attachments are not in compliance with chapter 5 OSRC. Joist hangers shall be installed or ledger and attachment to be designed by engineer of record.

- Fire Blocking is lacking in garage walls to floor system.

- Stair system has been reconfigured from the approved plan and has questionable bearing and support.

- The approved plans show the furnace location on the slab in the back of the garage; the furnace has been installed in the attic imposing additional loads to the bottom of the trusses without proper documentation submitted to the building department.

- The platform supporting the furnace is lacking proper framing and access.

- Trusses installed do not match approved plans.

Due to the major structural changes and the extremely tall crawl space (12 feet plus) the Engineer of record shall make a site visit and perform a structural load path from the roofing to the foundation system, including but not limited to static and live loads, lateral loads, and connections. All results shall be shown on revised plans, all engineering shall display an original engineer seal and be submitted to the Building Official for review and approval.

Piscadlo Decl. Ex. 13, 1.

A few days later, Jones lifted the stop work order. The parties continued to have a contentious relationship throughout the construction of the four homes. On tens of occasions, Jones did not approve requested permits.[2] There are hundreds of approved and denied requests for permits in the record. LKS never points specifically to any single permit it alleges it was entitled to but did not receive.

For the purpose of resolving this motion, it is enough to say that generally LKS alleges Jones treated it unfairly and made it jump through hoops it allowed other builders to bypass. For example, Stanley alleges:

---

[2] At some point, the city contracted with outside inspectors to conduct the requested inspections with the idea that it would give the situation a "fresh set of eyes."

4 –ORDER

> 10. After construction was nearly complete on 812 Pioneer, Daryl Jones also required me to submit engineering for the deck, despite having previously approved the plans containing drawings of the deck. Mr. Jones claimed that a deck was not permitted even though the deck plans were contained in the original building plans that were approved.
>
> 11. Mr. Jones also required engineering for the retaining wall on 812 Pioneer even though grading had not yet been completed, and the wall was slightly under 4 feet in elevation.
>
> 12. In my review of the building permits and inspection notes, I did not find any other new construction projects in which the City required engineering to be submitted for a deck or retaining wall. The only such engineering was on permits by homeowners for additions, such as a new deck or retaining wall.

Stanley Decl., 3-4.

Regarding the deck, Jones pointed out that decks over 30 inches above grade required plans and a permit. Piscadlo Decl, Ex. 19, 14. The deck was over 30 inches above grade. Additionally, the plans approved merely contained a conceptual drawing of what a deck would look like, even stating "NOT NECESSARILY HOW THE STRUCTURE WILL FINALLY APPEAR." Piscadlo Decl. Ex. 18, 1. In his deposition, Stanley admitted there were no details regarding the deck on the approved plans. Piscadlo Decl. Ex. 1, 33. Some of the approved plans did not even contain the conceptual drawing of the deck, and none showed concrete footings or piers, or even whether the deck was on grade or raised. *Id.* at 33-34.

Regarding the retaining wall that Stanley alleges was "slightly" under four feet tall, there is no evidence Jones (or any other inspector) required engineering for the retaining wall. Instead, the inspector merely informed Stanley that the retaining wall might need a permit. Piscadlo Decl. Ex. 23, 3. Walls over four feet *or* supporting a surcharge require a permit. ORSC R105.2.

LKS's response in opposition, supported by several declarations, fails to identify a specific property interest, the denial of which is federally protected under a due process analysis.

5 –ORDER

Ultimately, the city issued a final occupancy permit for three of the houses. LKS never requested a final permit on the fourth house.

## STANDARDS

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

LKS brings three claims: (1) substantive due process; (2) defamation; and (3) intentional interference with economic relationship. Each claim fails.

**I. Substantive Due Process**

In order to succeed on a substantive or procedural due process claim challenging the denial of a permit, a plaintiff "must first demonstrate that he was deprived of a constitutionally protected property interest." *Gerhart v. Lake Co., Montana*, 637 F.3d 1013, 1019 (9th Cir. 2011). A protected property interest in a government benefit stems not from the Constitution itself, but "from an independent source such as state law—rules or understandings that secure certain

6 –ORDER

benefits and that support claims of entitlement to those benefits." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. State law can create a protected property interest when, by law, the decision maker lacks discretion to deny the permit once certain conditions are met by the applicant. *Gerhart*, 637 F.3d at 1019. Even an applicant's sincere belief in entitlement to a permit, even when that belief is based on past issuance of permits, is insufficient to create a protected property interest when state law does not require the issuance of a permit. *Id.* at 1020-21.

While LKS focuses extensively on Jones's alleged retaliatory acts, it devotes little analysis to the establishment of a protected property interest. This issue, however, is a threshold requirement for its due process claims. Instead, LKS argues:

> Nonetheless, Defendants argue that LKS had no property interest in the issuance of building permits and other building decisions. They argue that, even though LKS was singled out, its claim to a property interest was not "legitimate" because some of the citations where technically correct. This argument fails as a factual matter because *at least some of the required corrections were not lawfully based*.

Pl.'s Resp., 6 (emphasis added).

That Jones may have erred on some of the required corrections does not somehow establish that LKS was entitled to a permit. The Oregon Residential Specialty Code ("ORSC") applies to residential construction work such as LKS's work at issue. ORSC R101.2[3]; OAR 918-480-0002 (adopting ORSC). The code establishes "minimum requirements to safeguard the public safety, health and general welfare" from hazards posed by construction. ORSC R101.4.

---

[3] The 2011 ORSC relevant here is available at:
http://ecodes.biz/ecodes_support/free_resources/Oregon/11_Residential/11_ORResidential_main.html

7 –ORDER

The ORSC authorizes building inspectors such as Jones "to enforce the provisions of this code" and "render interpretations" of the code. R104.1.

To obtain a permit, the applicant must submit an application in writing identifying the work to be covered by the requested permit. ORSC R105.3. The ORSC confers discretion on the building inspector over whether to issue a permit. R105.3.1 ("If the *building official* is satisfied that the proposed work conforms to the requirements of this code and laws and ordinances applicable thereto, the *building official* shall issue *a permit* as soon as practicable."). LKS's argument that it had a protected property interest "because at least some of the required corrections were not lawfully based" is meritless. First, Oregon law confers broad discretion on the building inspector to issue a permit. Second, and more important here, LKS never points to any permit denial where it fully complied with the code.

LKS spends much time justifying its decision to veer from the approved (engineered) construction plans by using 2 x 14 doug fir beams. LKS argues Jones's request to have the engineer approve the substitution from the approved glulam headers was arbitrary and malicious. This argument, however, fails to support its due process claims. First, as noted above, Jones cited eight violations on the April 22, 2015 stop work order. Piscadlo Decl. Ex. 13, 1. LKS does not challenge the other violations, including that the plans called for the furnace in a garage but LKS placed it in the attic without submitting proper documentation as to the "additional loads to the bottom of the trusses." LKS does not argue that, contrary to the stop work order, the garage walls had fire blocking or that the reconfigured stairs or trusses matched the approved plans.

Additionally, it is undisputed that Stanley did not use the beams approved by the engineer. While Stanley insists 4 x 12 lumbar is at least as strong as the engineered glulams,

8 –ORDER

Stanley is not an engineer. When a builder deviates from engineered plans, the building inspector has the discretion and authority to require the engineer to approve the changes. ORSC R106.4.

LKS never clarifies its alleged protected property interest because LKS concedes that there were code violations that did not entitle LKS to a permit. Instead, LKS merely points to permit issues that in its mind were simply unfair. For example, on the 835 Chikamin house, Stanley's "biggest issue" was the refusal to approve the plumbing and insulation in the basement. Stanley Depo., Piscadlo Decl., Ex. 1, 44-45. Neither issue remotely supports a due process claim.

The approved plans showed concrete in the garage and an unfinished basement. Stanley testified that no matter what the plans showed, he knew any buyer would "eventually . . . want to finish it out" as it was a nine foot basement. *Id.* at 46. Stanley testified, "So I'm already down there pouring [concrete in the garage] so I might as well go ahead and pour [concrete in the basement]." *Id.* Stanley poured the concrete despite knowing that unlike the unfinished basement (on the approved plans), a finished basement required insulation and an inspection of the rebar. *Id.* at 46-47. Stanley also knew he lacked that inspection when he poured concrete over the insulation and rebar.

Stanley's deposition testimony on this issue bears repeating as it demonstrates the weakness of LKS's due process claim. Stanley testified that an opportunity to inspect the insulation and rebar came when LKS had plumbing installed in the basement:

> [We called for an inspection] and I think they were right in the middle of pouring or something when [Jones] came on-site.
>
> I got a phone call from the plumber or somebody saying that they had gotten a little bit ahead of themselves and started to pour.
>
> And I said did [Jones] sign off. Well, he just left. He didn't say anything. I said, well, I don't know exactly what that means.

9 –ORDER

>Now this is again in the rough-in stage on it. So this is not, you know, we still got – [Jones] comes back several times after that and he never mentioned it or said anything to me at that point.
>
>Q. But you agree that the plumbing was covered up before Daryl –
>
>A. Evidently it was, yeah. But, again, all he would have had to say was I'm sorry, I can't sign that off, you are going to have to bust that area out again and I will come back, you can't go any further, *but he lets us go completely on with the rest of the house before he says anything six months later.*
>
>Q. He never completed the plumbing inspection, right, because he couldn't?
>
>A. No, but he came back for the plumbing inspection and the walls of that and he is walking on the same floor.

Stanley Decl., Piscadlo Decl. Ex. 1, 48-49 (emphasis added).

"Rough inspection of plumbing . . . shall be made prior to covering or concealment[.]" ORSC R109.1.2. It is the duty of the applicant to notify the inspector when work is ready for inspection. ORSC R109.3. On the permit for the "Underslab plumbing downstairs," Jones listed the status as "Covered Without Inspection" and also noted the concrete truck was on site and the plumbing was covered with "fresh poured concrete" when he arrived. Piscadlo Decl. Ex. 27, 5. LKS did not have a protected property interest in obtaining a permit on plumbing its subcontractor covered with concrete before any inspection began. Again, this is Stanley's "biggest issue" with Jones's actions at the 835 Chikamin house.

In its conclusory and brief section addressing the crucial issue of whether defendants in fact deprived LKS of a protected property interest, LKS points to only three cases supporting its argument that "It has been long held that developers and builders have a constitutionally-proctected property interest in issuance of building permits, occupancy permits, zoning permits, and the like. *Paterek v. Village of Armada*, 801 F.3d 630, 648-49 (6th Cir. 2015); *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988); *David Hill Development v. City of Forest Grove*,

10 –ORDER

2012 WL 538155 at *25 (D. Or.)." Pl.'s Resp., 6. *Paterek*, a Sixth Circuit case, glosses over the protected property interest question in one sentence, merely stating that under Michigan law, the business had a recognized property interest in the zoning authorization as issue. 801 F.3d at 648. Because that case: (1) contains no analysis of how state law can create a protected property issue in a permit; (2) applies a Michigan statute; and (3) concerns a business operating under a zoning authorization (as opposed to a residential construction permit applicant), it is not instructive to the facts here.

In *Bateson*, the city withheld a building permit even though the applicant satisfied all of the requirements necessary to obtain the permit. The applicable regulation stated that once plans comply with the code, "the building official *must* issue a building permit to the applicant." 857 F.2d at 1303. Here, LKS points to no denial of any permit where it fully complied with the ORSC. LKS at best demonstrates Jones demanded strict compliance with the code. Under the ORSC, "The *building inspector* shall . . . inspect the premises for which such permits have been issued and enforce compliance with the provisions of this code." ORSC R104.2. Without demonstrating strict compliance with the code, LKS cannot establish defendants deprived it of a protected property interest. *See Emmert Indus. Corp. v. City of Milwaukie*, 450 F.Supp.2d 1164, 1176-77 (D. Or. Aug. 30, 2006) (distinguished *Bateson* because applicant did not meet all requirements for issuance of a permit).

LKS argues *David Hill Development* is on point. Pl.'s Resp., 7. In a motion for a new trial, Judge Acosta ruled that the developer had a protected property interest after securing a binding, preliminary plat approval. *Id.* at *24 (citing *David Hill Development*, 688 F.Supp.2d 1193, 1217-19 (D. Or. February 23, 2010). The jury only dealt with the second prong of the due process claim, whether the city's actions were arbitrary and unrelated to any rational

11 –ORDER

governmental interest. *Id.* While LKS demonstrates the majority of its argument to Jones's arbitrary actions, it has not—unlike the plaintiff in *David Hill Development*—established any protected property interest.

At summary judgment, Judge Acosta analyzed Or. Rev. Stat. 92.040 (2007), which made preliminary plat approval "binding upon the city or county for the purposes of the preparation of the subdivision or partition[.]. 688 F.Supp.2d at 1218. Examining that statute, the Oregon Court of Appeals concluded "preliminary plat approval is made binding so that the developer can move forward with construction of the project, 'with the assurance the city cannot later change its mind.'" *Id.* (quoting *Bienz v. City of Dayton*, 29 Or. App. 761, 769 (1977)). With the exception of approved construction plans, the ORSC contains no analogous provision. Regarding approved plans, the ORSC states:

> Work shall be installed in accordance with the *approved construction documents*, and any changes made during construction that are not in compliance with the approved *construction documents* shall be resubmitted for approval as an amended set of *construction documents*.

R106.4.

The evidence demonstrates defendants never requested corrections for any work LKS performed in accordance with any approved construction documents. Instead, Jones requested engineering approval when LKS deviated from approved plans: i.e., when LKS deviated from an approved flat ceiling; deviated from engineered headers; and put a furnace in the attic when the approved plans placed it on a slab in the basement. Contrary to LKS's argument, *David Hill Development* is not analogous to the facts here.

LKS's claim is similar to that discussed in *Wyrostek v. Nash*, 984 F.Supp.2d 22 (D.R.I. 2013). There, a residential builder alleged the inspector singled it out and generally demanded

strict compliance with the building code. Plaintiffs there built a finished basement despite plans approving a crawl space. Ultimately, the inspector's concerns that the finished basement would violate the county's height restrictions was unfounded. But the court noted the inspector's burdensome requirements fell far from shocking the conscience:

> Moreover, what is clear is that not every perceived slight or discourteous act by a public official constitutes a due process violation, and the federal courts are not designed to be a Universal Miss Manners, overseeing the day-to-day conduct of town hall business.

*Id.* at 27.

At oral argument, when pressed to point to a specific property interest, LKS pointed to building permits it received before starting construction. But those initial building plans only authorize construction in accordance with those plans. Any changes "not in compliance with the approved construction documents shall be resubmitted for approval[.]" ORSC R106.4. Inspectors are directed to ensure compliance with the code. ORS 455.148. LKS deviated from the approved building plans and admits to code violations. It was not entitled to any permit and lacked any protected property interest.

Because LKS fails to establish that defendants deprived it of any protected property interest, its substantive due process claim fails. Because LKS fails to establish that Jones deprived it of any constitutional right, its *Monell* claim against the city necessarily fails. *Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir. 2001).

Perhaps recognizing the weakness of its due process claims, LKS seeks leave to amend the complaint to raise an equal protection claim under a "class of one" theory. Pl.'s Resp., 12.

> Such claim requires evidence that Defendants intentionally and without rational basis treated the Plaintiff differently from other[s] similarly situated. There is obviously substantial overlap between the potential claim and the due process

13 –ORDER

claims; the evidence is essentially the same, but the elements are slightly different.

*Id.* (internal citations omitted).

For several reasons, LKS's request for leave to amend is denied. First, in violation of local rule 15-1, LKS failed to attach a copy of the amended pleading to its motion. Second, the motion is untimely. Discovery closed months ago. Pretrial documents are due in less-than 60 days. While there may in fact be some "overlap" between the claims, there are also important differences. For instance, at least with respect to a protected property interest, how a building inspector treated others is irrelevant. *See Gerhart*, 637 F.3d at 1020-21 (applicant's reasonable belief of entitlement to a permit, even when "grounded in the County's past practice of leniently granting approach permits," fails to establish property interest). A "class of one" equal protection claim, however, depends entirely on plaintiff establishing that defendants treated it differently than others similarly situated. *N. Pacifica LLC v. City of Pacifica,* 526 F.3d 478, 486 (9th Cir. 2008). The parties would require additional discovery to find: (1) whether there were any residential builders similarly situated to LKS; and (2) whether defendants treated those others differently. Assuming LKS met that hurdle, it would also need to establish that Jones treated it differently without any rational basis for doing so. *Id.* But making a builder strictly comply with the building code's minimal requirements is, as a matter of law, rational. In other words, even assuming LKS's motion complied with the rules and was timely, leave here would be futile as Jones had a rational basis for his actions.

## II. Defamation

LKS alleges Jones defamed it by telling the CCB that LKS had a "sham" license. Any comments Jones made to the CCB, however, are privileged because the CCB is a licensing body.

14 –ORDER

*See Moore v. West Lawn Memorial Park, Inc.*, 266 Or. 244 (1973) (noting absolute immunity applies to statements made to licensing bodies). In *Moore*, the Court concluded allegedly defamatory statements made in a letter to the State Board of Funeral Directors and Embalmers were entitled to absolute immunity and could not support a defamation claim. The privilege applied even to "unsworn, out-of-court statements because encouraging the sending of information to a licensing body is in the public interest." *Id.* at 251. Any statements Jones made to the CCB therefore cannot form the basis of a defamation claim.

      LKS also argued Jones told other contractors LKS did not pay its subcontractors. First, this is a mischaracterization of the evidence. The only evidence on this issue is that there were rumors around construction sites that LKS was not paying its subcontractors. Thorp Decl., Ex. 1, 12. As Jones testified, "It was not me spreading the rumor, but it was a rumor going around at that time." *Id.* Rather than spreading the rumors, Jones merely told the subcontractors discussing the rumors "don't believe in rumors, go right to them and ask them." *Id.* at 12-13. While there is no evidence Jones spread rumors about LKS, Stanley testified he was "sure, absolutely" that Todd Franks told other contractors Stanley had not paid him. Piscadlo Decl. Ex. 1, 25.

      "In the professional context, a statement is defamatory if it falsely 'ascribes to another conduct . . . incompatible with the proper conduct of his lawful . . . profession." *Neumann v. Liles*, 358 Or. 706, 711-12 (Or. 2016). LKS somewhat clumsily attempts to demonstrate Jones's alleged statements were false:

> Mr. Jones' statements to the CCB and others about framers not getting paid was at most a half-truth. It was true that LKS did not pay F & P Contracting, but misleading to not reveal that the reason was that F & P Contracting was not legally working on the project in the first place and had no legal basis for payment. "Truth" is recognized as an affirmative defense to defamation; "half-truth" is not, as half-truths can be as misleading as lies.

15 –ORDER

Pl.'s Resp., 13.

Regardless of LKS's unsupported argument regarding "half-truths," it is undisputed that LKS did not pay the framers. Thus, even assuming Jones told subcontractors that Jones did not pay its subcontractors—and, again, there is absolutely no evidence of this in the record—those statements were not false because LKS admits it did not pay its subcontractors.

### III. Intentional Interference with Economic Relationship

In Oregon, a claim of intentional interference with economic relations requires: (1) a professional relationship; (2) intentional interference with that relationship; (3) by a third party; (4) by improper means or for an improper purpose; (5) a causal effect between the interference and damage to the professional relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). As noted, there is no evidence that Jones interfered with any relationship between LKS and any of its subcontractors or potential subcontractors. There is no evidence Jones interfered with the relationship between LKS and any potential purchaser of a home. While LKS makes much of Jones's comment that he would not issue a final occupancy permit, it is undisputed that he never inspected the plumbing before LKS covered it with concrete.

Even assuming Jones's comments to the CCB are not privileged, they do not support a claim of intentional interference with economic relations. A contractor's relationship with its licensing body is not a voluntary professional relationship required for an intentional interference claim. Judge Brown discussed a case instructive here where a bar alleged a police officer interfered with its relationship with the Oregon Liquor Control Commission ("OLCC") by reporting on various police encounters at the bar. *Westwood v. City of Hermiston*, 787 F.Supp.2d 1174, 1187-88 (D. Or. April 15, 2011). Judge Brown pointed to Oregon cases discussing the various relationships protected, and that the tort's purpose was to "protect the integrity of

16 –ORDER

voluntary economic relationships, both commercial and noncommercial, that would have very likely resulted in a pecuniary benefit to the plaintiff but for the defendant's interference." *Id.* at 1188 (quoting Fox v. Country Mut. Ins. Co., 169 Or. App. 54, 75 (2000)). Judge Brown concluded plaintiff's "relationship with the OLCC is not a 'voluntary economic relationship' but arises from the statutory requirement that sellers of alcoholic beverages must obtain a license from the OLCC." *Id.*

LKS does not have a voluntary relationship with the CCB. Contractors in Oregon are required to maintain a license with the CCB. ORS 701.021. At oral argument, LKS explicitly stated one with complaints regarding the licensing of a contractor would in fact go to the CCB. Therefore, Jones's comments to the CCB cannot support a claim of intentional interference with economic relationship.

## IV. Objections to LKS's Declarations

The parties dispute the admissibility of several declarations LKS submitted in response to the motion for summary judgment. The declarations, however, have little to no relevance to any claim at issue, and bear little relation to the facts in evidence. For example, real estate broker Katie Morehead, Bill Stanley's daughter, submitted a declaration stating:

> 2. I began listing 810 Pioneer, 812 Pioneer, and 835 Chikamin for sale around October or November, 2015. Over the next several months, I was told by other realtors that realtors in Silverton would not show these houses for several reasons, including that the Silverton building department "do not like outsiders," and because of "who the builder was" and rumors about their construction.
>
> 3. In early 2016, I was contacted by Katie Schmidt, another broker who had held an open house for 810 Pioneer. According to this broker, a prospective buyer had heard that 810 and 812 Pioneer "had foundation issues."
>
> 4. In September 2016, I had a prospective purchaser of 812 Pioneer pull out of the sale because the purchaser heard that the City of Silverton is suing LSK Enterprises for bad workmanship.

17 –ORDER

ECF No. 32, 1-2.

Defendants are not liable to LKS for any and all rumors heard by brokers from potential purchasers. There is no evidence in the record that Jones made any statements, to anyone, regarding the foundation of the houses or that the city was suing LKS for "bad workmanship."

Elizabeth Martin, a member of LKS, submitted a declaration stating:

> 2. On or about April 22, I was driving by our projects in Silverton, Oregon. As I was sitting in my car, I watched Daryl Jones post the "stop work" notice on 810 Pioneer. Todd Franks and Jose Garcia were both present. The three of them were laughing as Daryl Jones posted the "stop work" notice.

ECF No. 33, 1.

As noted, it is undisputed that when Jones issued the stop work order on 810 Pioneer, the engineer had yet to approve the changes Stanley made from the approved plans. Whether Jones, Franks, and Garcia shared a chuckle over a joke or over Jones's scheme to pay back the out-of-town builder does not change the fact that defendants did not deprive LKS of any protected property interest.

## CONCLUSION

Because LKS lacked a protected property interest, its substantive due process claims fail. Because defendants never defamed LKS or interfered with any economic relationship of LKS, its state claims fail. Defendants' motion for summary judgment, ECF No. 16, is GRANTED.

IT IS SO ORDERED.

DATED this 6th day of March, 2017.

/s/ Michael McShane
Michael McShane
United States District Judge